# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AXIOM INVESTMENT ADVISORS, LLC | Case No. _____ |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| BARCLAYS BANK PLC and BARCLAYS CAPITAL, INC., | |
| Defendants. | |

## COMPLAINT

## NATURE OF THE ACTION

1.      This is a class action brought to recover the damages that Plaintiff and a class of similarly situated participants in the foreign exchange ("FX") market suffered as a result of Defendant Barclays Bank PLC's and Barclays Capital Inc.'s (together, "Barclays") practice of reneging on its limit orders offered through its own and third-party electronic trading platforms. The allegations herein are based on information and belief, except as to Plaintiff's own actions.

2.      Barclays is one of the largest currency dealers in the FX market and is a well-known "Liquidity Provider" or "Market Maker."  As a Liquidity Provider, it acts as both a buyer and seller of currencies through its own proprietary electronic trading platform known as BARX and through third-party electronic communications networks ("ECNs") described below by placing limit orders to buy or sell a stated amount of a currency at particular prices.

3.      Plaintiff and the Class members are Barclays' counterparties in these FX transactions.  Through BARX and other ECNs, Plaintiff placed market orders to trade a given volume of currency.  These orders constituted offers to transact at the best, immediately available prices.  Barclays, on the other hand, was a matched counterparty to those transactions with corresponding offers to transact at a specified price.  Plaintiff's trade order operates as an acceptance of Barclays' outstanding unilateral offer to trade and conversely, Barclays' outstanding offer to trade simultaneously operates as an acceptance of the customer's unilateral offer to trade, and Barclays accepted those offers through its placement of a limit order that matched Plaintiff's order.

4.      Many times, however, Plaintiff and the Class members did not receive the agreed-on contract price, (*i.e.*, the best, immediately available price), but rather, received a worse price.  Instead, Barclays delayed the execution of matched trades and when it determined during the delay that the trade would be unfavorable to its position or that it could extract a larger profit, it reneged on the agreed price and often then filled Plaintiff's and Class members' orders at worse prices.  This practice has been dubbed "Last Look" and Barclays' Last Look practices caused significant damages to Plaintiff and the Class while unjustly enriching Barclays.

5.      Throughout the class period, Barclays has used Last Look to reject millions of trades that would have been otherwise executed but for Barclays reneging on its matched order.  As a result, Barclays breached those contracts, as well as breached the covenant of good faith and fair dealing.  By promoting its prices as "executable," when they were not, Barclays has

unfairly deceived Plaintiff and the Class.  Barclays' conduct caused injury to Plaintiff and Class members and caused Barclays to be unjustly enriched at their expense.[1]

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the Class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one Class member is a citizen of a State different than Barclays.

7.      This Court has personal jurisdiction over Barclays.  Barclays has: (1) transacted business in the United States, including in this District; (2) exchanged currency with Class members throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of its unlawful scheme in the United States, including in this District.

8.      Venue is proper in this District under 28 U.S.C. §1391(b), (c), and (d).  Barclays resided, transacted business, was found, and had agents in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## PARTIES

9.      Plaintiff Axiom Investment Advisors, LLC ("Axiom Investment Advisors") is a Delaware limited liability company headquartered at 375 Park Avenue, New York, New York 10152 during times relevant to this Complaint.

---

[1]      Except as alleged in this Complaint, neither Plaintiff nor other members of the public have access to the underlying facts relating to Barclays' improper activities.  Rather, that information lies exclusively within the possession, custody, or control of Barclays and other insiders, which prevents Plaintiff from further detailing Barclays' misconduct.  Plaintiff believes further evidentiary support for the allegations will come to light after a reasonable opportunity for discovery.

10.     Defendant Barclays Bank PLC is a British public limited company headquartered at 1 Churchill Place, London E14 5H, England.  Barclays Bank PLC is licensed by the New York Department of Financial Services with a registered address at 745 Seventh Avenue, New York, New York 10019 and a foreign representative office at One MetLife Plaza, 27-01 Queens Plaza North, Long Island City, New York 11101.  Defendant Barclays Bank PLC on its own behalf and through its control of Defendant Barclays Capital Inc. and BARX engaged in FX transactions with Plaintiff and the Class that are the subject matter of this lawsuit.

11.     Defendant Barclays Capital Inc. is a Connecticut corporation with headquarters at 745 Seventh Avenue, New York, New York 10019.  It is a wholly owned subsidiary of Barclays Group US Inc., which is a wholly owned subsidiary of Defendant Barclays Bank PLC. Defendant Barclays Capital Inc. has investment banking, capital markets, and private investment management business in the United States.  It has been registered with the U.S. Commodity Futures Trading Commission ("CFTC") as a Futures Commission Merchant since 1990, an approved Exempt Foreign agent since 1992, and a Commodity Pool Operator and Commodity Trading Advisor since 2009.  Defendant Barclays Capital Inc. on its own behalf, through its control of BARX, and under control from Defendant Barclays Bank PLC engaged in FX transactions with Plaintiff and the Class that are the subject matter of this lawsuit.

12.     Defendants Barclays Bank PLC and Barclays Capital Inc. are referenced collectively in this Complaint as "Barclays."  Barclays, as used in this Complaint, includes all of Barclays' predecessors, subsidiaries, or affiliates that played a material role in the unlawful acts alleged herein.

## FACT ALLEGATIONS

## Background on the FX Market

13.     The FX market is where currencies are traded.  It is the largest and most actively traded financial market in the world.  According to the most recent BIS Triennial Central Bank Survey,[2] global trading in FX averaged $5.3 trillion per day in April 2013, up from $4.0 trillion in April 2010.[3]  United States trading in FX averaged $1.263 trillion per day in April 2013, up from $864 billion in April 2010.[4]

14.     The FX market revolves primarily around spot transactions.  A spot transaction involves the exchange of currencies between two counterparties on a value date that is within usually two bank business-days' time, which is typically how long it takes a currency trade to settle.  Spot transactions account for approximately half of daily FX turnover in the United States, roughly $620 billion.[5]

15.     Forward transactions are another major component of the FX market.  In FX forwards – also called "outright forwards" – the exchange (settlement) of the currencies is delayed beyond the customary two bank business-days' time, often months into the future.  FX forwards trade just like FX spots; their market prices simply reflect the impact of differing

---

[2]     The BIS Triennial Central Bank Survey describes itself as "the most comprehensive source of information on the size and structure of global foreign exchange (FX) and OTC derivatives markets."   Bank for International Settlements, Triennial Central Bank Survey, Foreign exchange turnover in April 2013: preliminary global results (available at https://www.bis.org/publ/rpfx13fx.pdf) (hereinafter BIS, Triennial Bank Survey, Preliminary Results 2013), at 3.  Central banks, including the Federal Reserve Bank of New York, and other authorities in 53 jurisdictions participated in the survey, collecting data from 1,300 banks and other financial institutions throughout the world.  Id.

[3]     BIS Triennial Bank Survey, Preliminary Results 2013, at 3.

[4]     Fed Triennial Bank Survey 2013, at 1.

[5]     Fed Triennial Bank Survey 2013, at 3.

interest rates over time.   Forward transactions account for approximately 18% of daily FX turnover in the United States, or roughly $228 billion.[6]

16.     Approximately 98% of FX trading occurs over the counter ("OTC"),[7] meaning that it does not occur on a centralized exchange.  FX trading is thus predominately accomplished through bilateral contracts between two counterparties.

17.     Almost all FX trading occurs with Liquidity Providers such as Barclays.  One of the top ten Liquidity Providers in the FX market acts as a counterparty in approximately 98% of spot trading volume in the United States. In the forward market, the market share of the top ten Liquidity Providers is approximately 88%.[8]  Barclays' share of the overall FX market is roughly 10%, making it the third largest Liquidity Provider by volume.

18.     Large banks, such as Barclays, act as Liquidity Providers or Market Makers. They represent the "sell side" and are typically "price makers."  Plaintiff and the Class represent the "buy side," which includes institutional investors, asset managers, corporations, hedge funds, and wealthy private investors.   They are typically "price takers."

19.     Market Makers quote prices for a given volume of a specific currency pair.  The price consists of both a "bid" and an "ask."[9]  The "bid" is the price at which the Market Maker is willing to buy a given volume of the base currency.  The "ask" is the price at which the Market Maker is willing to sell a given volume of the base currency.  A Market Maker is willing to either buy or sell.

20.     By way of example, a Market Maker might quote the following price for Euros:

---

[6]     Fed Triennial Bank Survey 2013, at 3.

[7]     BIS, Triennial Bank Survey, Preliminary Results 2013, at Table 1.

[8]     Fed Triennial Bank Survey 2013, at 6.

[9]     The "ask" is also referred to as the "offer."

| Currency Pair | Bid | Ask |
|---|---|---|
| EUR/USD | 1.0588 | 1.0591 |

21.    In this example, the currency pair is Euros to U.S. dollars, reflected by EUR/USD. Euros are the base currency, *i.e.*, the currency the Market Maker is willing to buy or sell. The U.S. dollar is the reference or quote currency, *i.e.*, the currency which is used for pricing. Here, the Market Maker is willing to buy Euros from a customer at a price of $1.0588 per Euro. The Market Maker is willing to sell Euros to a customer at a price of $1.0591 per Euro.

22.    The difference between the bid and ask is called the "bid-ask spread." In the above example, the bid-ask spread is $0.0003, calculated as the difference between the price the Market Maker will sell Euros ($1.0591) and buy Euros ($1.0588). The bid-ask spread is one way in which the Market Maker is compensated.

**Electronic Trading of FX**

23.    Traditionally, most FX was traded via voice (telephone) trading. A customer would simply call one or more banks and request a quote for a given volume of currency. The bank would offer the customer a spread on the currency. If the customer accepted by buying or selling at the offered spread, the trade would be processed. This process was known as a "request for quote" or "RFQ."

24.    Over the last 15 years or so, FX trading has moved from voice to electronic trading platforms. Electronic trading offers customers the advantages of speed, convenience, automation, and precise record-keeping. Today, most FX trades occur electronically.

25.    There are two general types of platforms used to electronically trade FX. The first type is known as a single-dealer platform. A single-dealer platform, as its name suggests, is an electronic platform where liquidity is traditionally provided by a single dealer, *i.e.*, the

operator of the platform.[10]  Barclays' proprietary platform BARX ("BARX") is one of the most popular single-dealer platforms.  The BARX platform offered two trading systems, BATS and BARX.  Most major banks have established single-dealer platforms on which their customers can trade.

26.     BARX has its own website (www.barx.com).  It bills itself as providing "24-hour, two-way executable streaming prices in over 80 currencies and 480 currency pairs."[11]  According to its website, BARX has distinct contact numbers for clients across the world, its own support staff, and its own sales personnel.  It has been operating for many years.  One article describes BARX as follows: "BARX was the first platform to offer precision pricing in 2005, which was followed by the first two-way streaming prices for FX options in 2006.  2013 saw the launch of BARX Gator, a cutting-edge FX trading tool providing more efficient execution for clients."[12] 80% of Barclays FX trading volume is now conducted solely on BARX.

27.     The second type of electronic FX trading platform is a multi-dealer platform, commonly referred to as an ECN.  Some of the most popular ECNs used by the buy side are Hotspot FX, FXall, and Currenex.  These ECNs provide a user with access to multiple Liquidity Providers, including Barclays.

28.     Barclays' FX trading is conducted through three broad categories: (1) clients that trade directly on BARX using Barclays' graphical user interface ("GUI"); (2) clients that trade using ECN (such as Hotspot FX, FXall, and Currenex), that provides access to multiple Liquidity

---

[10]     Today, many single-dealer platforms, such as BARX, also allow their customers to access liquidity from outside sources.

[11]     http://www.barx.com/ (last visited November 25, 2015).

[12]     http://thegatewayonline.com/technology/technology-at-a-bank/barclays-barx.

Providers, including Barclays; and (3) clients that trade directly with Barclays using a financial information exchange application program interface ("FIX/API").

29.     Whether a single-dealer platform or another ECN, all electronic FX trading platforms work basically the same way.  They provide the end-user with price and quantity data for various currency pairs.  Depending on the platform and the user settings, that data can come from a single Liquidity Provider, such as Barclays, multiple Liquidity Providers, or all participants sharing data on the platform.

30.     The following is a screenshot of the user interface for BARX:



31.     To illustrate the similarity between the interfaces of different platforms, below is a screenshot for a leading multi-bank ECN, HotSpot FX:



32.     Subject to exceptions not relevant here, on BARX, Barclays alone would provide the data that appears.  On other ECNs, the data would come from various Liquidity Providers, as well as other buy-side market participants.

33.     Liquidity Providers, such as Barclays, provide pricing information to the buy-side market participants on platforms in multiple ways.  One way is through a constantly updating stream of executable bid and ask prices for a currency pair.  These streaming prices represent the market prices at which the Liquidity Provider is willing to buy or sell a specified quantity (*e.g.*, $1 million, $5 million, or $10 million) of that currency at a given moment.

34.     A streaming price is the result of a limit order placed by a Liquidity Provider on a platform, which can be executed at any time until it is cancelled.  Consistently, Barclays markets BARX as providing "24-hour, two-way executable streaming prices in over 80 currencies and 480 currency pairs."[13]

35.     When trading on a single-dealer platform such as BARX, end-users typically see only one streaming bid and ask price at any given time – that of the single Liquidity Provider prepared to act as counterparty.  On a multi-dealer ECN, by contrast, end-users see a stack of streaming prices from various Liquidity Providers and other market participants sorted to show the best available prices on both the bid and ask side (referred to alternatively as a "price ladder" or "market depth").  For example:

---

[13]     http://www.barx.com/ (last visited November 25, 2015).



36.     Another way Liquidity Providers such as Barclays provide pricing information on electronic trading platforms is by responding to a buy-side market participant's request for quote ("RFQ") or request for stream ("RFS") on a specified quantity of currency.  The Liquidity Provider then creates a customized quote that takes into account the size of the order and the identity of the market participant placing the order, including any special relationship that the Liquidity Provider has with the market participant.  Like with the streaming prices, the market participant then has the option to place a trade at the quoted price until that quote is cancelled.

37.     The bid and ask prices that Liquidity Providers quote to a counterparty as a result of a request for quote, or request for stream, often differ from the executable bid and ask prices that Liquidity Providers stream to the market.

38.     All platforms clearly distinguish between executable streaming prices and prices that result from a request for quote, or request for stream.  The former update constantly and can

change in milliseconds.  The latter appear only as a result of a specific request from an end-user, which are usually valid for a set period of time.

39.     Buy-side market participants' electronic orders can be broadly grouped into one of two categories: (1) market orders, which execute at the prevailing market price; and (2) limit orders, which execute only if the prevailing market price is equal to or better than a specific price input by the end-user.

40.     When a buy-side market participant enters an order, sophisticated computer algorithms match that order to other orders within the electronic FX platform, including by Liquidity Providers.  For limit orders, the algorithms are supposed to match and execute an order only if there are orders within the platform matching the desired limit price.  For market orders, the algorithms will match and execute an order to the order representing the best available market price currently within the platform.  Once two orders are matched, a contract is formed and neither can be withdrawn or match with another order.

41.     As noted above, for orders placed on a single-dealer platform, the matching and execution algorithms are programmed by the Liquidity Provider – in the case of BARX – Barclays.  For orders placed on multi dealer ECNs, the matching and execution algorithms are ostensibly programmed by the ECN.

**Barclays Uses "Last Look" Algorithms to Avoid Agreed Pricing**

42.     One of the major benefits of trading electronically is the speed with which trades can be executed.  A second represents an eternity in the FX market.  Market activity can quickly move market prices.  The speed of execution is particularly important during times of market volatility, where the speed and magnitude of price movements are exacerbated.

43.     Most platforms, including BARX, have technology enabling them to match and execute nearly 100% of all trades in under five milliseconds.[14]  Similarly, all Liquidity Providers, including Barclays, have technology enabling them to place and withdraw limit orders (*i.e.*, a streaming price) within one or two milliseconds.

44.     Barclays understood the importance of fast execution of electronic trades.  Market prices can vary significantly in a second.  Accordingly, Barclays has the technology to execute matched orders in a matter of milliseconds. In the interdealer market, Barclays quickly executes electronic trades with other large banks.

45.     However, when dealing with Plaintiff and the Class, Barclays programmed an unnecessary delay of anywhere from several hundred milliseconds to several seconds into its execution algorithms.  This intentional delay has been dubbed the last-look period ("Last Look").

46.     Barclays first implemented this intentional delay, its Last Look, on BARX in September 2008.  Barclays applied Last Look to all API/FIX and ECN trades, as well as a portion of those customers using Barclays' GUI.

47.     With Last Look, when a customer entered a market order for a particular currency on BARX that corresponded with a Barclays' limit order, Barclays' algorithms matched the customer's market order to Barclays' limit order within several milliseconds.  Absent its Last look, Barclays would have executed the matched order in several more milliseconds.  Instead, however, Barclays' algorithms delayed the execution for sometimes at least several hundred milliseconds, during which time Barclays used the information derived from the order (quantity, buy or sell, etc.) to its trading advantage.

---

[14]     1,000 milliseconds equal 1 second.  Five milliseconds thus equal 1/200th of one second.

48.     Barclays programmed into its execution algorithms the unilateral ability to renege on an otherwise executable transaction by withdrawing, after it had already been accepted, Barclays' limit order to which the buy-side order was matched.

49.     When the bid-ask spread at the end of the hold time moved in the client's favor beyond a predetermined threshold, Barclays reneged on the trade.  When the mid-price at the time the counterparty executed the trade moved beyond a predetermined threshold by the end of the hold period, BARX rejected the trade.  When clients executed multiple trades during the hold period, BARX could reject some, or all, of multiple trades placed within the hold period.

50.     In some circumstances, Barclays' use of Last Look would not only result in trades being rejected, but BARX would fill orders at the price at the end of the hold time if – and only if – the prices moved in Barclays' favor beyond a predetermined threshold.  For example, customers that traded "at market" through FIX/API would have their prices adjusted by Barclays at the end of the hold period if the market moved in the customer's favor beyond a predetermined threshold.

51.     Barclays also implemented Last Look on customer orders that were entered as "stop loss" or "stop limit" orders, which are designed to limit an investor's loss in a position.  In these orders, the customer predetermines that a trade should be executed once the market price reaches a particular level.  The order remains on Barclays' order book until the price is reached.  Except, Barclays would apply a hold period, and the order would not be executed until the end of hold time (or otherwise adjusted or rejected depending on if other Last Look protocols applied).  As a result, the order would be executed at a price that was less advantageous to the customer.

52.     By reneging on its limit orders when doing so was to its financial benefit, Barclays significantly and artificially increased its FX trading profits at the expense of buy-side counterparties.

53.     Not only did Barclays program the ability to delay and reject matched buy-side orders on its own BARX platform, but it also used the same practices on ostensibly independent ECNs.

54.     Although buy-side market participants can (and do) execute trades directly with each other on ECNs, Liquidity Providers such as Barclays still act as a counterparty in the vast majority of FX trades executed on ECNs.  Because relatively few dealers are willing or able to act as market-makers – to take either side of a trade even in volatile markets; to carry substantial FX exposure on their books – ECNs had to attract major Liquidity Providers such as Barclays to their platforms in order to generate any appreciable exchange volume.

55.     ECNs earn money by charging a fee based on the volume of currency exchanged through their platforms.  Without the liquidity provided by Barclays and other major dealers, there would be significantly less flow of FX volume on ECN platforms, and ECNs would go out of business.

56.     As a condition of providing liquidity to ECNs open to buy-side market participants, Barclays used its leverage to implement Last Look on ECNs.  Granting such concessions to Liquidity Providers such as Barclays was essential to any start-up ECN's economic survival:  ECNs were hostage to Barclays' demands.

57.     Thus, while the matching of orders on ECNs is controlled by the ECNs' algorithms, once any order is matched to Barclays' limit order, Barclays' algorithms still delayed execution of matched orders and determined whether the trade will execute at all.

58.     This happens notwithstanding the fact that ECNs claim that the prices appearing on their platforms represent immediately executable offers to trade on the stated terms.  Leading ECN Hotspot FX, for example, advertises on its website that the benefits of trading on its platform "include full depth-of-book view, centralized price discovery, direct and anonymous market access, ***instantaneous trading on live, streaming prices*** and robust real-time pricing, benchmark, and reference data."[15]

59.     At least the following ECNs have granted or continue to grant Barclays last-look privileges, including the ability to renege on matched orders: Hotspot FX, Currenex, EBS Direct, BLOOMBERG, 360T Trading Networks, and FXall.  These ECNs cater to clients all over the United States and the world.  Notably, when Liquidity Providers trade directly with each other on multi-dealer platforms, they do not use Last Look.

**Examples of How Barclays Used Last Look to Damage Buy-Side Market Participants**

60.     When a buy-side market order is matched to Barclays' streaming price on either BARX or an ECN, Barclays knows that its limit order is the best available price at which that market order can execute and that while it is matched the market order cannot match with any other order.

61.     While delaying the execution of the matched order and preventing the order from proceeding with another counterparty, Barclays places a new limit order that is slightly more profitable for Barclays, withdraws the matched trade, and waits for the buy-side order to match with its new limit order, giving it the ability to execute the trade at a more profitable price-point.

62.     The ECN market depth example below can provide an illustrative example.

---

[15]     http://www.kcghotspot.com/overview/index.jsp (emphasis added) (last accessed on January 28, 2015).



63.     This ECN interface shows the market depth for the currency pair GBP/USD, sorted from highest to lowest price on the bid side (buy orders), and from lowest to highest on the ask side (sell orders).  A market participant wanting to buy one million GBP at the current market price sees that the best offer to sell is at the price of $1.60388, which is significantly cheaper than the next-best price of $1.60393.  The market participant thus places a market order and should receive a price of $1.60388 as it would have matched with the corresponding limit order.  However, if Barclays placed the limit order at $1.60388, Barclays' Last Look protocols may renege on the trade at $1.60388 and place a new limit order for $1.60392.  With $1.60392 now reflecting the best price, and the buyer's order unable to match with another order while it

was matched with Barclays, the ECN's algorithm would then match the buyer's market order with Barclays' limit order at the higher price and Barclays' algorithms would again use its logic to decide whether to perform and realize the profit created by its breach or renege on this new agreement and repeat the cycle.

64.     Through this bait-and-switch – which takes place in less than half of a second – Barclays extracted additional profit at the expense of the unsuspecting buy-side market participant.  The buy-side participant would only see the final terms of the trade, and would assume that the sell order at $1.60388 was either withdrawn or filled by another trade in the milliseconds before its market order was placed.

65.     Significantly, if a buy-side market order was matched to the order of another buy-side market participant on an ECN, the platform's algorithms would execute the matched trade immediately (in a matter of a few milliseconds).  And because trading on ECNs is typically anonymous, a buy-side participant would not know whether its counterparty was a Liquidity Provider such as Barclays, whether its order had been last-looked, or whether its order had been rejected and subsequently executed at a less favorable price.

### Barclays Systematically Used Last Look to Injure Plaintiff and Other Buy-Side Market Participants

66.     Barclays is a counterparty to thousands of electronic spot and forward FX transactions daily.  Collectively, these daily transactions are worth hundreds of billions of dollars.

67.     On BARX's website,[16] Barclays promotes BARX as "the finer breed of foreign exchange," saying that "[o]ur proprietary platform leads the way with 'Precision Pricing.'  An extra decimal place raises your trading game to a new level of precision."  Barclays further touts

---

[16]     http://www.barx.com/client-offering/foreign-exchange.html.

BARX's "evolved execution," which includes more "control" in the form of "[l]ive single-click executable streaming prices for spot, outrights, forwards, swaps, NDFs, options and strategies," and "[e]xceptional execution speed" and "Precision Pricing - valuable pricing to 0.1 of a pip." Another portion of BARX's website[17] discusses FX orders and explains that customers can "take ultimate control of  your FX trade execution" through a "unique liquidity model that enables clients to trade with the market through manual, algorithmic of [sic] our proprietary hybrid model to experience the best possible execution."  Yet another Barclays' webpage[18] promotes BARX Gator™, which is claimed to "bring[] together interbank market liquidity from multiple venues and combines it with the BARX PowerFill orderbook and Barclays' own liquidity.  This robust execution tool, built for and road-tested by our own Barclays spot traders, offers clients a clear view of the true FX market and direct access to all the liquidity Barclays enjoys."  As a result, according to the BARX website, "[o]ur proprietary model provides a unique scaled display of combined hybrid liquidity that is regularly updated through a complex modeling process to give clients 'best of both worlds' liquidity and so, the best possible execution."  Until, October 3, 2015, Barclays did not publicly disclose that its ability to Last Look was programmed into its algorithms.

68.     Barclays' misrepresentations, omissions of material facts, acts of concealment, and failures to disclose, were knowing and intentional, and made for the purpose of deceiving Plaintiff and Class Members and obtaining their monies for Barclays' gain.

69.     During the 2009-2015 period, Barclays rejected hundreds of matched electronic FX trades every day using Last Look.  Over the course of the last six years, Barclays has rejected tens of thousands of matched electronic FX trades on BARX and on various ECNs using Last

---

[17]     http://www.barx.com/client-offering/foreign-exchange/fx-orders.html.

[18]     http://www.barx.com/client-offering/foreign-exchange/fx-orders/barx-gator.html.

Look.  These rejected trades have injured thousands of unsuspecting buy-side market participants such as Plaintiff and Class members by causing their orders to be executed at less favorable prices.  Simultaneously, Barclays has used Last Look to generate millions of dollars of profit that it would not have earned had it allowed matched electronic FX trades to execute as intended, and as Class members expected.

70.    As noted in a July 2014 article titled "FX Focus – Look Back in Anger" – published in leading industry publication FX WEEK – the use of Last Look to reject matched trades is difficult to prove with currently available information because what goes on inside electronic trading platforms is largely opaque to buy-side market participants.[19]  But the article also described how one senior trader at a buy-side bank was able to find "compelling evidence" of Liquidity Providers' abuse of Last Look:

> Such behaviour is hard to prove, but a senior e-FX trader at a large, London-based bank believes he has found compelling evidence of it, after completing some research for a client.  "We put together a chart on the response times and order fill ratios of the 12 banks this client traded with.  They were all big banks – essentially the top dozen liquidity providers in the market," he says.
>
> The trader found that, of the 12 banks, four had average response times of less than 100ms and order fill rates of 88–98%.  A further four had average response times of 250–350ms and an average fill rate of around 75%.  "That's quite a significant increase in latency when you consider all these pricing engines are co-located.  There should be very minimal differences in latency between the top providers," he says.
>
> The trader's suspicions of last look being abused were heightened by the data from the final four banks, which had an average latency of 450–550ms and fill rates of 50–65%.  "That basically means those dealers are using last look to throw away every single trade they don't like.  That is not about latency protection – it's about unfair liquidity provision."

---

[19]    http://www.fxweek.com/fx-week/analysis/2354192/fx-focus-look-back-in-anger    [note that this is a subscription website].

While 500ms might not sound a long delay to the average person, the FX market has numerous price updates every second of every trading day.  "If you think about it in terms of a hundred metres race, the difference between 25ms latency and 500ms latency is the difference between being first and being five or 10 metres behind the guy who comes first.  Half a second is an eternity in this market," he says.

\*     \*     \*

The heads of e-FX trading at three other global dealer banks also say they have noticed such behaviour.  All three wished to remain anonymous and declined to point the finger at specific firms, but one indicated that at least 60% of his sell-side competitors engaged in the practice.  Several other major banks either declined to comment on this topic or were unable to provide a response by press time.

71.     Similar evidence is not available to Plaintiff because it does not have access to the detailed trade logs that would show whether and when Plaintiff's market orders were matched to Barclays' orders; whether Barclays last-looked Plaintiff's orders, and if so, for how long; whether Barclays rejected Plaintiff's orders via Last Look and if so, whether those rejections caused Plaintiff's orders to be filled at less favorable prices.

72.     Likewise, Plaintiff does not have access to Barclays' algorithms that were used to initiate the last-look delay on Plaintiff's orders or that contained the logic by which these algorithms rejected Plaintiff's and other buy-side market participants' orders.  This information can only be obtained through discovery.

73.     Nevertheless, because Plaintiff routinely executed spot FX trades with Barclays both on BARX and on third-party ECNs, and because Barclays routinely used Last Look with respect to the matched orders of buy-side users, it is inconceivable that Barclays did not reject at least one of Plaintiff's matched orders using Last Look.

74.     Plaintiff and other Class members were directly and proximately injured by Barclays' use of Last Look to renege on matched orders on electronic trading platforms.

Barclays rejected matched trades that would have been favorable to Plaintiff and the Class and detrimental to Barclays.  As a consequence, matched buy-side orders were filled at a less favorable market price.  Barclays' and ECNs' electronic trading records will show the amount of damages Plaintiff and Class members suffered as a result of Barclays' use of Last Look, but Plaintiff expects that class-wide damages will be in the millions of dollars.

**Barclays Concealed that It Used Last Look to Renege on Otherwise Executable Orders**

75.     As set forth above, Barclays' website made extravagant claims for the precision and control conferred upon BARX customers that allegedly ensured the "best possible execution."  These claims are substantially untrue.  Barclays also did not disclose its use of Last Looks on other ECNs through which it operated.

76.     Barclays has never directly disclosed to buy-side FX platform users the fact that it programmed its execution algorithms to delay and reject matched orders.  Indeed, buy-side market participants have no way of knowing either that the execution of a trade was delayed by Barclays' use of Last Look, or that Barclays reneged on an order after it was matched to a buy-side order.  All that market participants can see is the final product of the executed trade; the steps taken on the path to execution are opaque and not disclosed.  And because the entire chain of events from order to confirmation of execution usually takes place in less than a second, nothing put buy-side participants on notice that their orders were delayed or rejected through Last Look.

77.     For those trades that were not filled due to Barclays' use of Last Look, Barclays took additional steps to obfuscate its actions.

78.     To further conceal this practice, trades that were rejected by Last Look and not filled would receive an error message: "NACK," or not acknowledged.

79.     Barclays' employees also took steps designed to limit the number of employees who had detailed knowledge about the operation of Last Look.  For example:

a.  On June 6, 2011, a Barclays Managing Director and Head of Automated Electronic FX Trading wrote:  "Do not involve Sales in anyway [sic] whatsoever.  In fact avoid mentioning the existence of the whole BATS Last Look functionality.  If you get enquiries just obfuscate and stonewall."

b.  On August 4, 2011, a Barclays employee wrote to a trader:  "for the future, sales absolutely 100% do not know about the existence of Last Look and it shouldn't be a concern for them."

c.  On November 7, 2011, Barclays' Managing Director and Head of Automated Electronic FX Trading wrote:  "Do not discuss Last Look with Sales.  If there has been a sput [in rejected trades] just blame it on the weekend IT release say it's being fixed."

80.     BARX Support is the first point of contact for customers experiencing issues with BARX.  BARX Support was instructed to tell customers that trade rejections were caused by latency, and then to escalate the issue to BARX Sales if necessary.

81.     As a result, Barclays took steps to hide its use of Last Look from customers.  For example:

a.  On October 10, 2008, a New York Barclays Client Services employee announced the release of Last Look, emphasizing that it "gives traders the ability to configure a profit check."  The employee continued, "GUI clients will get a pop up for any of the[] rejects stating 'trade rejected due to latency.'  FIX clients will get a FIX reject message.  If any client does call up about a rejected trade . . . it is important that you state in any communication 'THE TRADE WAS REJECTED BECAUSE OF LATENCY.' . . . DO NOT talk about P&L on trades."

b.  On December 15, 2010, a Barclays client wrote, "[w]e have noticed that there were over 300 rejected orders with you today and the reason is 'NACK', could you pls have a look at them and advise what's causing it?"  After failing to receive a substantive response, the client followed up two days later, writing, "[w]e have not heard anything back with regards to the rejections. And this has become quite a serious matter. . . . We kept receiving top of the book rates from you and hitting your rate, but we got rejected by you 9 times out of 10 where we could have been well filled by other liquidity providers who have been providing competitive rates. . . . Could someone from your side shed some lights on the rejections? Whether they are due to technical difficulties or business decisions?"  There is no evidence that Barclays ever responded to these queries.

c.  On September 28, 2011, after several days had passed since a Barclays client had asked whether a trade rejection was due to Barclays' "price engine experienc[ing] delays or is it the result of an extreme market event/movement," Barclays staff directed a Sales employee, "because the client didn't chase us for an answer on the below last look rejection since Monday we have decided to park it for now and in case the client comes back, [another Barclays employee] will explain that the rejection was due to the market [sic] large volatility."

d.  On February 25, 2013, after inadvertently providing a Barclays client with the rejection message "AntEconomic failed by failing check," a Barclays Sales employee directed that "We should revert to naming ALL REJECTS the same NACK urgently . . . Clients are gonna come asking."

e.  On August 27, 2013, a support employee of an ECN noted "Barclays is frequently rejecting executions on the last available quote or sending rejection messages without a clear reason." In the same email chain, Barclays employees suggested explaining to the ECN "what last look is."

f.  On October 10, 2013, after a Barclays client questioned the reason for an "unusual amount of rejected orders" caused by Last Look, a BARX support employee familiar with Last Look wrote to the relevant Sales employee, "Would you like to go back to [the client] and tactfully explain? [BARX Support] cannot confirm or deny the existence of last look."

g.  On September 4, 2014, when a Barclays Sales employee emailed a BARX Support employee, the employee responded by describing Last Look as a "pricing check setup against BARX clients" to "ensure profitability of a trade for Barclays," but emphasized that "Our Team generally does not share this info with the client, and just say it was a business reject."

82.  Although the news of a "last look" being used by major Liquidity Providers first surfaced several years ago, they publicly insisted that Last Look was a necessary byproduct of providing FX liquidity on multiple FX platforms.  Because Liquidity Providers simultaneously place the same order on multiple different eFX platforms, they are ostensibly exposed to the risk of having that order executed on more than one platform – even if they intend to enter into only a single transaction on those terms.  Liquidity Providers thus claimed that Last Look was necessary to ensure that multiple trades were not executed on a single order.

83.  That explanation of Last Look proved to be both pretextual and highly misleading.  The explanation was pretextual because Liquidity Providers such as Barclays have

the technology to withdraw an order from an ECN in several milliseconds; they do not need several hundred times that long to determine whether their order has been filled on another platform.  The explanation was highly misleading because it suggested that Liquidity Providers only used Last Look to reject trades on orders that had already been filled elsewhere.  But in fact, Barclays routinely reneged on its executable orders for reasons other than that the order has been filled on another platform.

84.     The abuse of Last Look only started garnering attention in the buy-side FX community – albeit very limited attention – in the summer of 2014.  A July 11, 2014 article in FX WEEK titled "Last look orders come under scrutiny" warned, for example, that "[b]anks engaged in 'unfair liquidity provision' that could turn into [the] next FX scandal."  The article likewise noted that "[m]arket-makers stand accused of using Last Look order types aggressively to dial up the profitability of their books, with some buy-side participants warning the practice deserves as much regulatory scrutiny as the allegations of benchmark manipulation."[20]

85.     An August 28, 2014 article in FX WEEK titled "Clients switch off dealers using aggressive last-look strategies" reported that due to the recent revelation of Defendants' abusive practices, "[b]uy-side clients have begun to switch off banks that use aggressive last-look strategies and deliberately increase reject ratios, as market awareness of the pitfalls of this type of ordering grows."  The article went on to note that "[s]ome buy-side participants believe the practice could result in as big a scandal as the allegations of benchmark fixing that have blighted the industry for many months," and that "[i]t is understood sell-side participants have made the Bank of England aware of the issue."

---

[20]     http://www.fxweek.com/fx-week/news/2362297/clients-switch-off-dealers-using-aggressive-last-look-strategies.

**Regulatory and Industry Investigations of Last Looks**

86.     On the eve of announcements by regulators around the word that they had reached settlements with numerous Liquidity Providers for their roles in the manipulation of benchmark rates such as the WM Reuters Closing Spot Rates, on November 11, 2014, FX WEEK published an article titled "'Last look' will prevent settlement with regulators, warns New Change FX.'" The article quoted sources claiming that United States regulators, including the Department of Justice ("DOJ"), were investigating Liquidity Providers' last-look practices – though those investigations were "currently at an early stage."

87.     A December 11, 2014 BLOOMBERG article for the first time revealed that "New York regulators have found evidence that Barclays Plc and Deutsche Bank AG may have used algorithms on their trading platforms to manipulate foreign-exchange rates, a person with knowledge of the investigation said."[21]  According to an anonymous source familiar with the investigation, "[t]he algorithms were embedded in Barclays' BARX trading platform and Deutsche Bank's Autobahn system."

88.     A Reuters article published on February 10, 2015 indicated that Credit Suisse, Goldman Sachs, Société Générale and BNP Paribas have also been served with subpoenas issued by the New York regulators.  The article goes on to note the following:

> The banks started to produce information in response in late January and have met with officials handling the investigation, the sources said.
>
> At issue is a latency period between the time an offer is floated and accepted, and whether the banks are gaming their clients during that time, the people said.  At least one bank claims the pause in the programs is designed to protect it from high-frequency traders, one source said.

---

[21]     http://www.bloomberg.com/news/articles/2014-12-10/ny-regulator-said-to-probe-deutsche-bank-barclays-fx-algorithms.

> But others familiar with the practice say the time lag is a way for banks to manipulate the rates so they favor them.
>
> Transcripts of traders in online chat rooms that led to the settlements in November show them working together to move rates.
>
> There also are transcripts in which they discuss the manipulation of algorithms, one source said.[22]

89.    On or around March 3, 2015, it was reported that the DOJ and the Securities and Exchange Commission asked Barclays for information relating to BARX and its Last Look practices.  On November 18, 2015, Barclays entered into a Consent Order with the New York State Department of Financial Services.  Barclays admitted it used Last Look in the manner described herein, agreed to pay $150 million civil monetary penalty, agreed to terminate a Managing Director and Global Head of Electronic Fixed Income, Currencies, and Commodities ("eFICC") Automated Flow Trading, and agreed to an independent monitor.

## CLASS ACTION ALLEGATIONS

90.    Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following persons:

> All persons in the United States who, between January 1, 2008 and the present (the "Class Period"), placed an order either on BARX or a third party ECN that (1) was matched to Barclays' streaming price; (2) was rejected by Barclays and (3) was subsequently filled at price less favorable that the original Barclays' price to which it was matched.
>
> Specifically excluded from this Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant and any person acting on their behalf.

---

[22]    http://www.reuters.com/article/2015/02/10/usa-banks-probes-idUSL4N0VK61V 20150210.

> Also excluded from this Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

91.     The Class is readily ascertainable and is one for which records should exist.

92.     Due to the nature of the trade and commerce involved, Plaintiff believes that there are thousands of geographically dispersed Class members, the exact number and their identities being known to Barclays and the ECNs to which it streamed prices.

93.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and members of the Class sustained damages arising out of Barclays' common course of conduct in violation of the laws alleged herein.  The damages and injuries of each member of the Class were directly caused by Barclays' wrongful conduct.

94.     There are questions of law and fact common to the Class, including, but not limited to, the following:

A.     whether Barclays programmed its eFX execution algorithms to reject executable orders via Last Look;

B.     whether Plaintiff's and Class Members' orders constituted offers;

C.     whether Barclays' limit orders constituted offers;

D.     whether Class members' orders that were matched to Barclays' limit orders constituted acceptance of Barclays' outstanding offers;

E.     whether Class members' orders that were matched to Barclays' limit orders constituted acceptance of Plaintiff's and Class Members' outstanding offers;

F.     whether Barclays' matching of customer trade orders constituted acceptance of customers' offers;

G.     whether Barclays' use of Last Look to reject matched orders on eFX platforms constituted breaches of contract;

H.     whether Barclays' use of Last Look to reject matched orders on eFX platforms breached its duties of good faith and fair dealing; and

I.     the appropriate Class-wide measures of damages.

95.     Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class, and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and FX-related litigation to represent themselves and the Classes.

96.     Questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class.

97.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and Barclays, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Breach of Contract on BARX

98.     Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

99.     Plaintiff's and Class members' orders for currency trades to be executed at the best available market price constituted unilateral offers that Barclays could accept through performance. Plaintiff and Class members offers required their orders to be matched using the

FX platforms' algorithms and required that any such matched orders would be immediately executed.

100.    When Barclays began running algorithms on Plaintiff's and Class members' trade orders, Barclays accepted Plaintiff's and Class members' offers, thereby contractually binding Barclays to execute matched orders at the best available prices.

101.    Each time Barclays failed to execute Plaintiff's and Class members' trade orders when those orders algorithmically matched Barclays' own outstanding offers, Barclays breached its contracts with Plaintiff and Class members.

102.    Plaintiff and Class members were directly and proximately damaged by Barclays' breaches of contract because following the Barclays' rejection of the matched trades via Last Look, Plaintiff's and Class members' market orders were filled at less favorable prices or not at all.  Plaintiff and Class members are thus entitled to recover the difference between the prices offered by Barclays and the prices at which Plaintiff's and the Class members' orders were ultimately filled.

## SECOND CLAIM FOR RELIEF
### Breach of Contract on Other ECNs

103.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

104.    Plaintiff's and Class members' orders for currency trades to be executed at the best available market price constituted unilateral offers that Barclays could accept through performance.

105.    Likewise, Barclays' orders for currency trades to be executed at specified prices constituted unilateral offers that Plaintiff and Class members could accept through performance.

106.    Simultaneously, Plaintiff's and Class members' orders for currency trades to be executed at the best available market price constituted acceptances of any outstanding algorithmically-matched orders.

107.    Likewise, Barclays' orders for currency trades to be executed at specified prices constituted acceptances of any outstanding algorithmically-matched orders.

108.    When Plaintiff's and Class members' orders for currency trades were algorithmically-matched with Barclays' orders for currency trades, those complementary trade orders became binding contracts.

109.    Each time Barclays failed to honor Plaintiff's and Class members' algorithmically-matched trade orders, Barclays breached its contracts with Plaintiff and Class members.

110.    Plaintiff and Class members were directly and proximately damaged by Barclays' breaches of contract because following the Barclays' rejection of the matched trades via Last Look, Plaintiff's and Class members' market orders were filled at less favorable prices or not at all.  Plaintiff and Class members are thus entitled to recover the difference between the prices offered by Barclays and the prices at which Plaintiff's and the Class members' orders were ultimately filled.

### THIRD CLAIM FOR RELIEF
**Breach of Implied Covenant of Good Faith and Fair Dealing**

111.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

112.    Upon the formation of a contractual relationship between Plaintiff and Class members and Barclays, Barclays had the obligation to perform its obligations under the contract in good faith and not contrary to the intention of the parties in forming the contract.

113.    To the extent that Barclays' use of Last Look to reject matched orders on BARX and other ECNs was not strictly a breach of contract, it was a breach of Barclays' covenant of good faith and fair dealing.

114.    Barclays knew that Plaintiff and Class members created accounts and trading relationships with Barclays with the understanding and expectation that any orders matched to Barclays' limit orders would be executed at the matched prices.

115.    By rejecting matched orders that should have been executed in the normal course, Barclays acted in bad faith and specifically with the intent to generate additional FX trading profit at Plaintiff's and Class members' expense.

116.    Barclays' conduct in violation of its covenant of good faith and fair dealing had the effect of destroying Plaintiff's and Class members' benefit of the bargain in establishing accounts and trading relationships with Barclays.

117.    As a direct and proximate result of Barclays' breaches of the covenant of good faith and fair dealing when rejecting matched orders on BARX and ECNs, Plaintiff and Class members were directly and proximately damaged by having their orders execute at prices that were less favorable than Barclays' originally matched prices.

## FOURTH CLAIM FOR RELIEF
### Violation of N.Y. General Business Law §349

118.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

119.    Barclays' actions constitute unfair, unconscionable, and/or deceptive trade practices in the course of its business and in the conduct of trade or commerce, in violation of the New York Deceptive Trade Practices Act, N.Y. Gen. Bus. L. §349, *et seq.*  Barclays' actions have caused and will continue to cause financial harm to Plaintiff and the Class.

120.    Barclays' conduct as alleged herein has damaged and will continue to damage Plaintiff and Class members in an amount that is unknown at the present time.

121.    Such conduct includes the use of Last Look to invalidate binding contracts with FX customers, which conduct was never disclosed to such customers.

122.    Further, the conduct alleged herein also constitutes fraud, intentional misrepresentation, breach of contract, breach of the implied covenant of good faith and fair dealing, and violates N.Y. Gen. Bus. L. §349, *et seq*., as set forth below.

123.    The conduct herein is "unfair" because it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to custodial customers.

124.    Barclays' unfair, unlawful, and deceptive acts and practices alleged herein were "fraudulent" and have deceived and/or are likely to deceive Plaintiff and other reasonable FX customers.

125.    Barclays' unfair, unlawful, and deceptive acts and practices alleged herein were specifically designed to induce Plaintiff and the Class to permit their FX trades to be executed on Barclays' electronic trading systems.

126.    Barclays' misrepresentations and omissions alleged herein were material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making decisions concerning purchases of FX custodial services.

127.    Barclays' misrepresentations and omissions alleged herein are objectively material to the reasonable consumer, and therefore reliance upon such misrepresentations may be presumed as a matter of law.

128.    Barclays exploited its superior bargaining position and superior knowledge in implementing and executing Last Look.

129.    Plaintiff and Class members relied to their detriment on Barclays' misrepresentations and omissions in conducting FX trades pursuant with it.

130.    Plaintiff and each member of the Class have lost money and been damaged as a result of Barclays' unfair, unlawful, and deceptive conduct alleged herein.  They are accordingly entitled to injunctive relief and restitution, in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### Violation of N.Y. General Business Law §350

131.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

132.    Barclays' actions constitute acts of untrue and misleading advertising in violation of the N.Y. Gen. Bus. L. §350, *et seq*., by, *inter alia* failing to disclose the use of Last Look to the detriment of customers and fraudulently advertising its electronic trading networks as accurate and trustworthy.

133.    Barclays' misrepresentations and omissions alleged herein deceive or have the tendency to deceive the general public regarding the benefits of its electronic trading networks, and did deceive and mislead Plaintiff and the members of the Class.

134.    Barclays' misrepresentations and omissions alleged herein were the type of misrepresentations and omission that are material, *i.e.*, a reasonable person would attach importance to them and would be induced to act on the information in using Barclays' electronic trading networks Barclays knew that its omissions and misrepresentations were material when it made them.

135.    Barclays' misrepresentations and omissions alleged herein are objectively material to the reasonable consumer, and therefore, reliance upon such misrepresentations may be presumed as a matter of law.

136.    Barclays' false advertising is ongoing.  Unless restrained by this Court, Barclays could continue to engage in untrue and misleading advertising, as alleged above, in violation of N.Y. Gen. Bus. L. §350, *et seq*.

137.    As a result of the foregoing, Plaintiff and each member of the Class have been injured and have lost money or property, and are entitled to restitution and injunctive relief.

## SIXTH CLAIM FOR RELIEF
### Unjust Enrichment

138.    Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

139.    By using Last Look to reject matched orders on BARX and ECNs in order to increase Barclays' FX profits at the expense of Plaintiff and Class members, Barclays knowingly engaged in conduct that was unfair, unconscionable, and oppressive.

140.    Barclays knowingly received and wrongfully retained excess profits that rightfully belonged to Plaintiff and Class members.  In so doing, Barclays acted with conscious disregard for the rights of Plaintiff and Class members.

141.    By rejecting matched orders that should have been executed, Barclays has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class members.

142.    Barclays' unjust enrichment is traceable to, and resulted directly and proximately from, its wrongful use of Last Look.

143.    Under the common law doctrine of unjust enrichment, it is inequitable for Barclays to be permitted to retain the benefits it received, and is still receiving, from its wrongful

use of Last Look.  Barclays' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

144.    The financial benefits derived by Barclays rightfully belong to Plaintiff and Class members.  Barclays should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all wrongful or inequitable proceeds received by them.   A constructive trust should be imposed upon all wrongful or inequitable sums received by Barclays traceable to Plaintiff and Class members.

## REQUESTED RELIEF

145.    Plaintiff requests relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

B.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

C.    That the Court award Plaintiff and Class members damages and/or restitution in an amount to be determined at trial;

D.    That the Court issue appropriate injunctive and other equitable relied against Defendants;

E.    That the Court award Plaintiff pre- and post-judgment interest;

F.    That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses; and

G.    That the Court award such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial of all issues so triable.


Dated:   November 25, 2015

s/ Christopher M. Burke
Christopher M. Burke (CB-3648)
Walter W. Noss (WN-0529)
Kristen M. Anderson
Kate Lv
Scott+Scott, Attorneys at Law, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Phone: (619) 798-5300
Fax:  (619) 233-0508

Thomas K. Boardman
Scott+Scott, Attorneys at Law, LLP
405 Lexington Avenue
New York, NY 10174-4099
Phone:  (212) 223-6444
Fax:  (212) 223-6334

George A. Zelcs
Robert E. Litan
Randall P. Ewing, Jr.
Korein Tillery LLC
205 North Michigan Plaza, Suite 1950
Chicago, IL 60601
Phone:  (312) 641-9750
Fax:  (312) 641-9751

Stephen M. Tillery
Robert L. King
Aaron M. Zigler
Michael E. Klenov
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Phone:  (314) 241-4844
Fax:  (314) 241-3525

Michael D. Hausfeld
Reena A. Gambhir
Jeannine M. Keeney
Hausfeld, LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
Phone:  (202) 540-7200
Fax:  (202) 540-7201

Bonny E. Sweeney
Michael P. Lehmann
Hausfeld LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Phone:  (415) 633-1908
Fax:  (415) 358-4980

Linda P. Nussbaum
Bart D. Cohen
Bradley J. Demuth
Nussbaum Law Group, P.C.
570 Lexington Avenue
New York, NY 10022
Phone:  (212) 702-7053
Fax:  (212) 681-00300

*Attorneys for Plaintiff*